STATE ex Rel. LEAHY, Respondent, *v.* O'ROURKE et al.,
Appellants.

(No. 8477.)

(Submitted December 1, 1943.  Decided February 21, 1944.)

[146 Pac. (2d) 168.]

*Mr. E. N. Genzberger, Mr. S. O. Meyer* and *Mr. William Meyer,* for Appellants,

*Mr. Genzberger* and *Mr. William Meyer* argued the cause orally.

*Mr. R. P. Leahy,* for Respondent,

MR. JUSTICE ANDERSON delivered the opinion of the court.

This is an appeal from a judgment in an action brought under section 11124, Revised Codes, to abate a gambling nuisance. The case was tried to the court without a jury and findings were made holding defendants guilty of maintaining a gambling nuisance and enjoining the continuance thereof. Judgment was entered abating the nuisance with closing of the premises for a year.

As shown by the court's findings, the facts are these: An organization called the "Dokey Social Club" ran a place of entertainment and amusement in the city of Butte in a building fronting on one of the principal business streets. The building is owned by the appellants O'Rourke. The club occupied the ground floor with entrance door leading in from the street and open to the public. The appellant Hannifin was manager of the club.

The principal activity in the place was a game of "keno" participated in by any and all so desiring and who could find a place at the U-shaped counter in the rear room. The game was run by the Dokey Club and it is that which is alleged as the gambling nuisance sought to be abated. According to the findings, the game was operated as follows: "The patrons, men and women, sat on the chairs ranged around said counter; convenient to them

504

were cards in racks; the cards had 24 numbers and a blank space in the center which was free and common to all; no two cards bore the same numbers exactly, and the numbers ran from 1 to 75; the patron paid ten cents for one card, twenty cents for two cards, and so on, which was collected by an employee; on a stand near the eastern end of the room was a metal container and in it were 75 white balls each having a number different from those of the others and the numbers ran from 1 to 75; when all who desired to participate had paid and when everything was ready an employee spun the container on a pivot and thereupon drew a ball therefrom and announced its number; the number was also flashed on a board above the said employee; the player or players whose card or cards bore the number called placed a small slug on such number; the process was repeated until some player or players had slugs on all numbers straight across or straight up and down or diagonally on his card or their cards as the case may be; then the successful player or players shouted 'Keno'; an employee thereupon checked the card to make sure it was the winning card; immediately thereafter the winner received a part of the pot; the game then continued as before until a late hour of the night.''

In *State* v. *Hahn,* 105 Mont. 270, 72 Pac. (2d) 459, a game in all essentials the same was held to be a lottery and prohibited by sections 11149 to 11158, Revised Codes. In scores of other cases "keno" has been held to be a game of chance within the meaning of statutes prohibiting gambling. (*Trimble* v. *State,* 27 Ark. 355; *Brown* v. *State,* 40 Ga. 689; *Overby* v. *State,* 18 Fla. 178; *Portis* v. *State,* 27 Ark. 360; *Miller* v. *State,* 48 Ala. 122.) Gambling is a generic term, embracing within its meaning all forms of play or game for stakes wherein one or the other participating stands to win or lose as a matter of chance. Play at lottery is gambling. (*Bennett* v. *State,* 10 Tenn. 472, 474; *National Conference* v. *Farley,* 68 App. D. C. 319, 96 Fed. (2d) 861, 863.)

The nuisance statute, section 11124, Revised Codes, under which the present action was prosecuted, is intended to

reach all forms of gambling, including lotteries which are prohibited by sections 11149 et seq. as well as the many forms of gambling enumerated in and prohibited by sections 11159 et seq. The game of ''keno'' as played and carried on by the Dokey Club at 26 North Main was gambling and constituted a nuisance which might be enjoined and prevented by equity suit as in this case. The statute law giving the remedy, Chapter 29, Penal Code, secs. 11123-11133, Revised Codes, declares that gambling, when carried on at any particular place, is a nuisance and provision is made for its abatement and prevention. By section 11124, every building or place used for such purpose is declared to be a nuisance which it says shall be enjoined and abated and prevented. The form and manner of prosecution are provided for in the sections following. Section 11125 provides that ''Whenever there is a reason to believe that such nuisance is kept, maintained, or exists in any county of the state of Montana, the county attorney must, or any citizen of the county may, maintain an action in equity in the name of the state of Montana upon the relation of such county attorney or citizen as the case may be to abate and prevent such nuisance and to perpetually enjoin the person or persons conducting or maintaining the same, and the owner, lessee, or agent of the building, or place, in or upon which such nuisance exists, from directly or indirectly maintaining or permitting such nuisance.''

There is ample evidence to sustain the court's finding that gambling was carried on in the premises in question.

Defendants, however, claim immunity as a fraternal organization. Section 11159, as amended by Chapter 153, Laws of 1937, which is the general gambling statute, provides expressly that all religious, fraternal or charitable organizations, and all private homes are excluded from the provisions of the Act. Inasmuch as the mentioned organizations may play at the games therein enumerated without violating the law, there would be no nuisance resulting therefrom within the purview of sections 11124-11133, Revised Codes.

Whether the exemption from criminal liability so written into the general gambling law has any effect on a nuisance case such

as this, where the gambling offense was a lottery, is questionable but, as we view the case, that need not be determined here. The Dokey Club as it was shown to exist and carry on at 26 North Main was not such an organization as was exempt from prosecution for gambling of any kind.

The evidence shows some relationship between the club and the Knights of Pythias Lodge, and that is what is relied upon. It was made to appear that it was connected with the social organ of the Knights of Pythias, known as the Dramatic Order of Knights of Khorassan, and was used to raise money. Frye, the only defense witness, testified that he had been connected with the club for the past eighteen months; that it was organized by Al Hoosayn Temple No. 82, the local branch of the Dramatic Order of the Knights of Khorassan, which is the social branch of the Knights of Pythias; that members of the Dramatic Order are commonly known as "Dokeys", the name springing from the initials D. O. K. K., the first letters of the words which make up the name of the national organization. He said he was president of Al Hoosayn Temple No. 82, and ex officio president of the Dokey Social Club. He gave no evidence of any definite relation of the club to the other two organizations. It appears more as an enterprise promoted by certain members of the Dramatic Order of the Knights of Khorassan dealing with Jimmy Hannifin; its affairs and activities do not appear to be officially connected with the Dramatic Order of the Knights of Khorassan or the Knights of Pythias Lodge. It is not a branch of either of those organizations. Frye so testified.

Frye said that when he first knew of the Dokey Social Club it was operating in the Pythian Castle at 127 South Main Street. A "keno" game had been started there in the club rooms but the quarters proved inadequate and, hearing that the defendant Hannifin had a place and equipment at 26 North Main suitable to their purpose, they leased the place and have carried on there for a little over a year. The premises were hired and also Hannifin's services. Hannifin operated and managed the business of the club. Participation in the "keno" game and the facilities

of the club was not limited to any regular membership. Anyone could come in and anyone could play who was vouched for by a Dokey or by, what we may call, a "Keno" member. Frye testified: "My functions have been in charge of the front door. I sit at a desk between the front door and the inside door. I watch the people who come in and out; the members who come in and out. Sometimes they have guests with them. Of the person entering, I require a membership card and which I usually issue. The member must be vouched for by a Dokey to begin with and as we became stronger our other members could vouch for a guest and they could receive a membership card. I have the privilege of making new members if I so desire,—if I know the person personally." He further testified his hours at the door were from 7 p. m. to midnight, the regular hours of the "keno" game. Immediately off the entrance from the street was the lounging room 20 x 20 and in the rear thereof a larger room 35 x 70 where the "keno" game was run. The Dokey Club had no regular meetings; a meeting might be held at the request of members. The money taken in at the "keno" game was kept in a drawer. The receipts were checked at night by Jimmy Hannifin and put in the safe and thereafter deposited in the bank, and an accounting had at the end of each month. The operating expense, which included the rental for the premises, Hannifin's wages and the wages of other employees was taken out and the net of about $2,800 for the year was divided equally between the Pythian Castle Association, the Dramatic Order of the Knights of Khorassan, and the Dokey Social Club. The money so received by the Pythian Castle Association and the Dramatic Order of the Knights of Khorassan was used to pay building debt and for building repair. This was all brought out by the testimony of Frye.

The Dokey Club had none of the features of a fraternal organization. The "keno" game carried on at No. 26 North Main and the activities of the club at that place were all far removed from the legitimate activities of any fraternal organization. There was no regularity as to membership, anyone whom the

door-keeper was of a mind to let in being permitted to participate; there was no regularity as to meetings; and the activities, so far as shown by the evidence in the case, were for the purpose of profit. At 26 North Main, the Dokey Club was engaged in business and that business was gambling. The court's finding that it was not a fraternal organization is amply sustained. There is no basis for the claim of immunity.

The defense further urges as ground of reversal that the case ██ ██ has not been brought legitimately and that there is lack of good faith in the prosecution. The contention is that only the county attorney or some citizen who is specially injured by the nuisance complained of may bring such action, and that inasmuch as the complainant is in neither of these categories, the complaint fails to give the court jurisdiction. Also, it is pointed out that the complainant, who as attorney also is prosecuting the case, has been hired to act and serve as the complaining party and it is contended that he has not come into court with clean hands. The complainant in his testimony admitted that he had been paid $250 for lodging the complaint and lending himself as a party and witness in the prosecution. He said this was not for services as attorney. He would not say from whom the money was received.

The first point is not well taken. The statute, section 11125, Revised Codes, authorizing the prosecution provides that the "county attorney must, or any citizen of the county may, maintain an action", and so forth. The general rule is that such an action may not be brought by any other than the public authorities unless special provision is made therefor by statute. Our statute clearly makes such provision and we find no rule or principle of law of controlling effect which would invalidate the provision. The complainant, being a citizen of Silver Bow County, Montana, had the right to bring the action and the court thereby was given jurisdiction. (*Ex parte Allison*, 99 Tex. 455, 90 S. W. 870, 2 L. R. A., n. s., 1111, 122 Am. St. Rep. 653; *Littleton* v. *Fritz*, 65 Iowa 488, 22 N. W. 641, 54 Am. Rep. 19; 46 C. J. 728, sec. 310, 311, and 739 sec. 319.

As to the other point, while there might be ground for criticism of an attorney acting as a paid complainer and the sole complainant in the action which he also prosecutes as attorney of record, we do not believe that the presentation of the facts complained of has suffered thereby to the detriment of the case. There is no question raised as to the actual facts material to the case. There was no evidence controverting any of the facts brought out by the prosecution. With that situation, there is no reason why the court should question the motive of the complainant and the credibility of his testimony.

The case was tried to the court and the rule is that if there is any competent evidence to sustain its findings they should not be disturbed on appeal. Here the proof appears conclusive, and we think also that the court was right in the law conclusions reached.

None of the questions raised by appellants has sufficient merit to warrant a reversal and the judgment appealed from is affirmed.

MR. CHIEF JUSTICE JOHNSON and ASSOCIATE JUSTICES ERICKSON, MORRIS and ADAIR concur.